**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| TRACEY D. S., | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| v. | )   Case No.  23-CV-411-MTS |
| | ) |
| MARTIN O'MALLEY,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
|       Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Tracey D. S. requests judicial review of the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his application for disability benefits under the Social Security Act. Plaintiff appeals the decision of the Administrative Law Judge ("ALJ") and asserts the Commissioner erred because the ALJ incorrectly determined he was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision denying benefits.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

---

[1] Effective December 20, 2023, pursuant to Fed. R. Civ. P. 25(d), Martin O'Malley, Commissioner of Social Security, is substituted as the defendant in this action.  No further action need be taken to continue this suit by reason of 42 U.S.C. § 405(g).

experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920. Step one requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity (step one) or if the claimant's impairment is not medically severe (step two), disability benefits are denied.

At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to step four, where claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.

If the claimant's step four burden is met, the burden shifts to the Commissioner to establish at step five that work exists in significant numbers in the national economy which the claimant – taking into account his age, education, work experience, and RFC – can perform. Disability benefits are denied if the Commissioner shows the impairment which precluded the performance of past relevant work does not preclude alternative work. *See generally, Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.* at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). A court's review is limited to two inquiries: first, whether the correct legal standards were

2

applied; and second, whether the decision was supported by substantial evidence. *Noreja v. Soc. Sec. Comm'r*, 952 F.3d 1172, 1177 (10th Cir. 2020) (citation omitted). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The court must review the record as a whole, and the "substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). A court, however, may not re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991). Even if a court might have reached a different conclusion, the Commissioner's decision will stand if it is supported by substantial evidence. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

## Background and Procedural History

On May 22, 2020, Plaintiff filed an application for Title II disability insurance benefits (42 U.S.C. § 401, *et seq.*) under the Social Security Act. (R. 14). He alleged an inability to work beginning on January 11, 2020, due to back pain, degenerative disc disease, heart disease, liver disease, neck and elbow pain, stroke, and high blood pressure. (R. 14, 193, 203). Plaintiff was thirty-eight years old at the time of the ALJ's decision. (R. 27, 193). He has a tenth-grade education and past relevant work as a construction worker. (R. 26, 42, 55, 204).

Plaintiff's application was denied both initially and upon reconsideration. (R. 14, 94-97, 101-04). At Plaintiff's request, ALJ Deirdre Dexter conducted an administrative hearing on January 24, 2023. The hearing was held by teleconference pursuant to COVID-19 procedures. (R.

14, 273-74). ALJ Dexter issued a decision on February 7, 2023, denying benefits and finding Plaintiff not disabled. (R. 14-28). Plaintiff sought review by the Appeals Council, which was denied on July 25, 2023. (R. 1-6). As a result, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

## Decision of the Administrative Law Judge

Following the five-step sequential process, the ALJ determined at step one that Plaintiff had not engaged in substantial gainful activity since January 11, 2020. (R. 16). At step two, she found Plaintiff suffered from the severe impairments of degenerative disc disease, osteoarthritis of the bilateral knees (status-post right total knee arthroplasty), obesity, hypertension, alcohol use disorder with seizures due to withdrawal, and chronic obstructive pulmonary disorder ("COPD"). (R. 16). The ALJ determined at step three that Plaintiff's impairments did not meet or equal a listed impairment. (R. 18-19). Based upon her consideration of Plaintiff's subjective allegations, the medical evidence, and the medical source opinion evidence, the ALJ concluded that Plaintiff retained "the [RFC] to perform a reduced level of light work" with the following limitations:

> [Plaintiff is] able to lift, carry, push, or pull up to ten pounds frequently and twenty pounds occasionally, sit up to six hours in an 8-hour workday, and stand and/or walk up to three hours in an 8-hour workday. He is able to frequently balance, stoop, or crouch, occasionally climb ramps or stairs, kneel, or crawl, but the job should not involve climbing ladders, ropes, or scaffolds or work performed near unprotected heights or moving mechanical parts. The job should not involve concentrated exposure to fumes, odors, dusts, mists, gases, poor ventilation, or other pulmonary irritants.

(R. 19).

At step four, the ALJ determined Plaintiff had past relevant work as a construction worker. (R. 26). After consultation with a vocational expert ("VE"), the ALJ concluded at step five that Plaintiff could perform the representative jobs of inspector and hand packager, routing clerk, and cashier II, all of which she found existed in significant numbers in the national economy. (R. 27-

28, 56-57). As a result, the ALJ found Plaintiff had not been under a disability from January 11, 2020, through the date of the decision. (R. 28).

## Errors Alleged for Review

Plaintiff raises two allegations of error in his challenge to the Commissioner's denial of benefits on appeal: (1) the ALJ's assessment of Plaintiff's exertional RFC is not supported by substantial evidence; and (2) the ALJ failed to properly evaluate Plaintiff's subjective statements. (Docket No. 17 at 5-14). In response, the Commissioner argues the ALJ's RFC assessment is supported by substantial evidence and Plaintiff's reported symptoms are inconsistent with other evidence. (Docket No. 23 at 7-14).

## The ALJ's RFC Assessment

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996). The RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id*. at *7. The ALJ must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a "regular and continuing basis" and describe the maximum amount of work-related activity the individual can perform based on the evidence in the case record. *Id*. She must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id*. If there is a conflict between the RFC and a medical source opinion, the ALJ must "explain why the opinion was not adopted." *Id*. However, there is "no requirement in the regulations for a direct correspondence between an RFC finding

5

and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012). "[T]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004).

In determining the RFC, the ALJ discussed Plaintiff's symptoms (reports and testimony), the objective medical evidence, consultative examination, and prior administrative medical findings. (R. 19-26). Her decision provides a detailed chronological summary of Plaintiff's treatment history. (R. 21-25). In 2020, Plaintiff visited the emergency room and was hospitalized, related to alcohol abuse and alcohol withdrawal. (R. 21, 298-417). During several hospitalizations, Plaintiff left against medical advice. (R. 21, 310, 354, 387). At discharge in October of 2020, Plaintiff was assessed with "alcoholism with acute withdrawal, seizure associated with alcohol withdrawal, history of asthma not currently exacerbated, elevated blood pressure likely associated with withdrawal, and thrombocytopenia in the setting of alcoholism with acute alcohol withdrawal." (R. 21, 309-10). In November of 2020, his primary care physician, Mitchell Collier, M.D., recommended Plaintiff seek in-patient rehabilitation for alcohol, or at least seek out-patient treatment. (R. 21, 464).

Plaintiff underwent a consultative examination with Anita Williams, APRN, in March of 2021. (R. 21-22). He reported a disability based on pain in his back and right knee, rating his pain a three out of ten. (R. 21-22, 476-77). Range of motion was normal, except for a limited range of motion with flexion in the back. (R. 22, 477, 479). Straight leg raise testing was negative, ambulation was even with a steady gait and no assistive device, and heel, toe, and tandem walking were within normal limits. (R. 22, 478). Examination also showed Plaintiff's oxygen saturation at 96% room air, lungs clear to auscultation bilaterally, and unlabored and even respirations. (R. 21-22, 477).

Plaintiff reported knee pain to Dr. Collier in March of 2021. Right knee X-ray showed normal joint space with "slight valgus deformity on right" and bilateral spurs. (R. 22, 488). Examination revealed a right knee with full range of motion, but with tenderness to palpitation over the medial joint line. There was no crepitus and all ligaments felt intact. (R. 22, 493). Plaintiff's lungs were clear to auscultation bilaterally. *Id*. When Plaintiff returned in July of 2021, his lungs were clear to auscultation and his musculoskeletal examination was normal with no swelling or deformity present. (R. 22, 538, 546). Plaintiff had not gone to rehab for his alcohol disorder, but reported he was drinking less. (R. 22, 545).

Orthopedic surgeon Jennifer Peterson, M.D., examined Plaintiff in August of 2021, for bilateral knee pain, greater on the right than left. (R. 22, 554). Plaintiff's lumbosacral spine was non-tender to palpation with a full range of motion in all planes and straight leg raise test was negative bilaterally. (R. 22, 555). His left knee had a range of motion of 0-120 degrees with positive tenderness to palpation of the medial joint line, while the right knee had a range of motion of 0-115 degrees with positive tenderness with palpation of the medial joint line and mild tenderness to palpation of the lateral joint line. (R. 22, 556). X-rays showed severe medial compartment joint space narrowing with mild lateral and patellofemoral compartment joint space narrowing of both knees. *Id*. Dr. Peterson assessed Plaintiff with osteoarthritis in both knees and recommended he undergo a right total knee arthroplasty. (R. 22, 556-57).

In November of 2021, Plaintiff was examined by orthopedic surgeon Richard Thomas, M.D., related to his neck and back pain. Plaintiff reported he could only walk 100 feet. (R. 22, 612). An MRI of Plaintiff's lumbar spine showed discectomy changes from L5-S1 without recurrent disc herniation, multilevel spondylotic changes, and severe central canal stenosis from L2-L5. (R. 23, 608-09). When Plaintiff returned later that month, Dr. Thomas noted Plaintiff

could transition from a sitting to a standing position, listed forward slightly when ambulating, exhibited good strength in all myotomes through the lower extremities, could heel and toe walk, but had poor mobility with flexion and extension, secondary to pain. (R. 23, 696). He ordered a lumbar CT scan, which revealed no fracture or dislocation, spondylosis and multi-level severe degenerative disc disease causing mild to severe central canal stenosis and moderate to severe neural foraminal stenosis bilaterally, partial bony fusion changes at L5-S1 (possibly due to postsurgical changes versus congenital), and facet arthrosis and ligamentum flavum hypertrophy changes. (R. 23, 698-99). Plaintiff returned to Dr. Collier in December of 2021, and reported that he did not keep an appointment for an epidural steroid injection, because previous injections "hurt." (R. 23, 777). His examination included normal musculoskeletal findings, with no swelling or deformity, and his lungs were clear to auscultation bilaterally. (R. 23, 781).

In January of 2022, Plaintiff underwent a right total knee arthroplasty with Dr. Peterson. Post surgery, he complained of drainage from the incision. (R. 23, 701). Examination revealed a lumbar spine non-tender to palpation, full range of motion in all planes, and straight leg raise test negative bilaterally. (R. 23, 702). Dr. Peterson believed the drainage was secondary to post-operative swelling due to Plaintiff's failure to elevate and ice on a regular basis. She advised Plaintiff to elevate his leg above heart level and ice regularly. (R. 23, 703). She also provided him with a brace immobilizer. *Id*.

Plaintiff reported to the emergency room in January of 2022, complaining of shortness of breath for five days. He had 77% air saturation with a heart rate in the 140s. (R. 23-24, 636). Once placed on oxygen, his air saturation increased to 88%. *Id*. He reported smoking 1 ½ packs of cigarettes per day. (R. 24, 639). Pulmonary examination showed wheezing and rhonchi present with no rales. (R. 24, 640). Musculoskeletal examination revealed no tenderness, normal range

of motion, no edema in the lower extremities, and Plaintiff was able to stand and transfer from a wheelchair to the bed. *Id*. It was believed Plaintiff had severe COPD based upon his smoking history. (R. 24, 684). He was admitted to the hospital for COPD exacerbation and chronic heart failure exacerbation and noted to be non-compliant with fluid restrictions. (R. 24, 666). After being hospitalized for five days, Plaintiff left the hospital against medical advice. *Id*. He was provided with oxygen and medications, but he was advised these would not adequately treat his condition and he should remain in the hospital. *Id*. At a follow-up pulmonary visit in March of 2022, Plaintiff reported shortness of breath with activity and indicated he used Albuterol (but was currently out) and used oxygen while sleeping. (R. 24, 682). He was assessed with COPD and an acute lower respiratory infection. (R. 24, 683). Plaintiff was provided samples of Breztri and an Albuterol inhaler to use as needed and advised to return after a pulmonary function test. *Id*.

Plaintiff followed up with Dr. Peterson for his right knee in late January of 2022, reporting moderate pain but doing well with physical therapy. (R. 24, 704). Right knee range of motion was 0-120 degrees, he was ambulating well, and did not require an assistive device. (R. 24, 705-06). X-ray of the right knee showed components in good alignment and a well-fixed bone. (R. 24, 706). Dr. Peterson described Plaintiff's X-ray as "fantastic" and "graduated" him to outpatient physical therapy. *Id*. When Plaintiff attended physical therapy in February of 2022, he reported no pain and minimal loss of range of motion, loss of functional strength, and reduced function. (R. 24, 707). The physical therapist noted Plaintiff was functioning as "a safe ambulator on all surfaces, including up/down steps." *Id*. He was advised about swelling management and declined to continue physical therapy at that time. *Id*.

In February of 2022, Plaintiff reported to Dr. Collier that his physical therapist was concerned about swelling in the right knee. (R. 24, 752). Dr. Collier noted Plaintiff's incision

9

looked good and he had no pain, but the joint was red, hot, and swollen with a large effusion. *Id*. He prescribed Plaintiff an antibiotic and advised him to follow up with his orthopedist, which Plaintiff did not do. *Id*. When Plaintiff returned to Dr. Collier at the end of March of 2022, he complained of pain and swelling with a "bubble" behind his knee, with walking making it worse. *Id*. He followed up with Dr. Peterson in April of 2022, complaining of "clicking" and "burning pain" that was mild to moderate in the right knee. (R. 25, 712). On examination, Plaintiff's lumbar spine was non-tender to palpation, had a full range of motion in all planes, and straight leg raise test was negative bilaterally. (R. 25, 714). Right knee range of motion was 0-125 degrees with stable to varus valgus stress in full extension and subtle laxity throughout mid flexion and full flexion. *Id*. It was stable to anterior-posterior drawer with mild tenderness to palpation over the medial knee but no tenderness to palpation over the lateral joint line. *Id*. Dr. Peterson observed that Plaintiff ambulated well and had no difficulty getting on the exam table. *Id*. X-ray of the right knee showed components that were well-aligned and well-fixed, and the patella tracked midline. *Id*. Dr. Peterson noted Plaintiff's X-ray "look[ed] good," and she believed his burning pain was consistent with nerve pain. *Id*. She recommended Plaintiff attend physical therapy, which he declined to do. *Id*. Dr. Peterson ordered inflammatory markers to rule out infection, which resulted in normal findings. *Id*.

Plaintiff returned to Dr. Collier in May of 2022, complaining of pain in his right knee but nothing out of the ordinary. (R. 25, 745). He became "winded" at times and reported he had a pulmonary function test scheduled in June of 2022, and he was advised to keep the appointment. (R. 25, 737, 746). In June of 2022, Plaintiff reported that he used his rescue inhaler about every three hours (approximately 6-8 times per day) because his Breztri inhaler ran out. (R. 25, 737). He described his shortness of breath as worse on exertion. *Id*. In August of 2022, Plaintiff

complained that the back of his right leg was swelling, and he could not walk well. (R. 25, 727). His examination revealed that his lungs were clear to auscultation bilaterally, his extremities had no clubbing, cyanosis, or edema, and his musculoskeletal findings were normal, with no swelling or deformity. (R. 25, 728). By November of 2022, Plaintiff reported frequent shortness of breath and dyspnea on exertion. (R. 25, 717). He used oxygen intermittently and routinely checked his oxygen saturation levels. He also used Trelegy, Singulair, and Albuterol daily. *Id*. Plaintiff had not followed up for a pulmonary function test, and he was instructed to do so as soon as possible. (R. 25, 716-17). Plaintiff reported his knee pain was "fine." (R. 25, 718).

When considering Plaintiff's RFC, the ALJ also acknowledged the prior administrative medical findings of state agency reviewing physicians, William Oehlert, M.D., and Scott Newman, M.D., who both determined Plaintiff could perform light work with no climbing of ladders, ropes, and scaffolds, frequent stooping, and avoidance of moderate exposure to hazards. (R. 25, 77-81, 89-92). The ALJ found their opinions generally persuasive based upon considerations of Plaintiff's seizures due to alcohol withdrawal, alcoholism, decreased range of motion in the lumbar spine, and the recommendation for a right knee replacement, but she included greater limitations in the RFC assessment in light of Plaintiff's continued pain after his right knee replacement, subsequent lumbar findings, and his use of oxygen while sleeping. (R. 25-26).

In conclusion, the ALJ found Plaintiff's RFC "accommodates [his] physical impairments and is adequate to address the location, duration, frequency, and intensity of [his] bona fide symptoms as well as any reasonably anticipated aggravating and precipitating factors." (R. 26). She explained the RFC assessment as follows:

> Giving [Plaintiff] the benefit of the doubt, I have included hazard limitations due to seizure-like activity from alcohol withdrawal even though [Plaintiff] testified no seizure medication has ever been prescribed (testimony). The limitation of no exposure to pulmonary irritants is supported by [Plaintiff's] hospitalization for

> respiratory failure (Exhibit 15F) and his use of oxygen during sleeping hours (testimony) although he failed to present for a pulmonary function test (Exhibit 18F/3). The limitations to light exertion with the above postural limitations are supported by imaging of [Plaintiff's] lumbar spine noting spondylosis and multilevel severe degenerative disc disease causing mild to severe central canal stenosis and moderate to severe neural foraminal stenosis bilaterally. There were partial bony fusion changes at L5-S1, which might be due to postsurgical changes versus congenital, and facet arthrosis and ligamentum flavum hypertrophy changes (Exhibit 17F/5). It is also supported by [Plaintiff's] obesity (Exhibit 18F/10). I have also considered [Plaintiff's] right total knee arthroplasty in limiting [Plaintiff] to standing and/or walking three hours in an 8-hour workday and only occasional climbing of ramps and stairs, kneeling, and crawling even though he most recently reported to his primary care provider that he was doing fine (Exhibit 18F/4, 6).

*Id*.

Here, Plaintiff argues "the ALJ's conclusion that [he] could stand and/or walk up to three out of eight hours a day on a regular and continuing basis [is] unsupported by substantial evidence[.]" (Docket No. 17 at 9). He contends the ALJ's limitation to standing and/or walking for three out of eight hours per day fails to adequately account for his COPD and knee and back impairments, instead asserting that the ALJ should have included a sit/stand option or an option to alternate sitting and standing in the RFC. *Id*. at 8-9. As part of his argument, Plaintiff identifies certain evidence he contends the ALJ failed to consider. The ALJ, however, is not required to discuss every piece of evidence, but the ALJ's decision is "adequate if it discusses the 'uncontroverted evidence' the ALJ chooses not to rely upon and any 'significantly probative evidence' the ALJ decides to reject." *Wall v. Astrue*, 561 F.3d 1048, 1067 (10th Cir. 2009), citing *Frantz v. Astrue*, 509 F.3d 1299, 1303 (10th Cir. 2007).

Regarding his COPD, Plaintiff asserts the ALJ only included limitations for his exposure to pulmonary irritants and did not limit his standing or walking even though he frequently reported shortness of breath upon exertion and use of oxygen. (Docket No. 17 at 8). However, the ALJ's decision demonstrates that she considered the evidence, and the limitations included in the RFC

specifically address Plaintiff's COPD and are more limiting than the opinions of the state agency physicians.  (R. 20-26).  Moreover, although the ALJ did not specifically discuss Plaintiff's spirometry testing from December of 2021, which showed moderately severe obstruction with low vital capacity (R. 774), she acknowledged that Plaintiff likely suffered from severe COPD when hospitalized in January of 2022.  (R. 23-24).

Regarding Plaintiff's back impairment, he contends that based upon the objective studies of his back, it is "not factually reasonable" to expect him to perform the assigned RFC.  (Docket No. 17 at 8).  However, Plaintiff points to no evidence of additional functional limitations that the ALJ failed to consider.  Plaintiff also asserts the ALJ did not adequately account for his knee pain because she failed to mention a recommendation for a left knee replacement sometime in the future, the continued swelling of his right knee, and a recent fall.  *Id*. at 9, citing R. 612, 723, 730, 755.  A review of the decision, however, reveals that even though the ALJ did not specifically reference a possible left knee replacement surgery, she did consider Plaintiff's left knee pain and the swelling in his right knee when determining the RFC.  (R. 22-25).  Moreover, upon review of the record cited by Plaintiff regarding a fall in November of 2022, the record indicates the fall had nothing to do with Plaintiff's knees.  Plaintiff reported he "was walking in the kitchen [and] felt lightheaded/dizziness, f[ell] [and] hit the stove[.]" (R. 723).

The Court finds the ALJ discussed the evidence in detail and included limitations in the RFC assessment supported by the evidence.  *See Hill v. Astrue*, 289 Fed. Appx. 289, 293 (10th Cir. 2008) ("The ALJ provided an extensive discussion of the medical record and the testimony in support of [the] RFC finding.  We do not require an ALJ to point to 'specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before [she] can determine RFC within that category.'"), quoting *Howard*, 379 F.3d at 949.  Moreover, the ALJ's

13

RFC was more restrictive than the opinions of the state agency physicians, and Plaintiff points to no evidence of additional functional limitations that was not considered by the ALJ. To conclude otherwise would require the Court to reweigh the evidence in Plaintiff's favor, which it cannot do. *See Casias*, 933 F.2d at 800.

### The ALJ's Consistency Determination

When evaluating a claimant's symptoms, the ALJ uses a two-step process:

> First, [the ALJ] must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Second, . . . [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities[.]

SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017). As part of the symptom analysis, the ALJ should consider the factors set forth in 20 C.F.R. § 404.1529(c)(3), including: (i) daily activities; (ii) the location, duration, frequency, and intensity of pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken; (v) treatment other than medication for relief of pain or other symptoms; (vi) any other measures used by the claimant to relieve pain or other symptoms; and (vii) any other factors concerning functional limitations. *Id*. at *7-8.

Deference must be given to an ALJ's evaluation of a claimant's pain or symptoms, unless there is an indication the ALJ misread the medical evidence as a whole. *See Casias*, 933 F.2d at 801. An ALJ's findings, however, "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quotation omitted). "[S]o long as the ALJ 'sets forth the specific evidence he relies on in evaluating the [consistency of the claimant's subjective complaints],' he need not make a 'formalistic factor-by-factor recitation of the evidence.'" *Keyes-Zachary v. Astrue*, 695 F.3d

14

1156, 1167 (10th Cir. 2012), quoting *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). Thus, the use of conclusory language is "problematic only when it appears 'in the absence of a more thorough analysis.'" *Id*. at 1170, quoting *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004).

Plaintiff argues that although the ALJ provided a summary of the evidence, "the ALJ's decision provided no actual analysis of the extent to which such evidence supported or detracted from [Plaintiff's] statements." (Docket No. 17 at 12). He contends that had the ALJ conducted an appropriate analysis, "the evidence when applied to the relevant factors could have reasonably supported finding [Plaintiff's] statements to be generally valid."[2] *Id*. The Commissioner counters that the ALJ provided "well-supported reasons for concluding Plaintiff's reported symptoms were not as severe as he claimed[,]" including considerations of Plaintiff's treatment history, the objective medical evidence, and the efficacy of his treatment. (Docket No. 23 at 8).

The Court finds Plaintiff's argument unpersuasive. As part of the evaluation of Plaintiff's subjective complaints, the ALJ outlined the two-step process set forth in SSR 16-3p and the requirements of 20 C.F.R. § 404.1529. (R. 19). She discussed the medical conditions disclosed by Plaintiff on his Adult Disability Report from November of 2020 (R. 20, 203), his function report from October of 2021 (R. 20, 254-61), and his hearing testimony. (R. 20, 37-53). The ALJ considered Plaintiff's reports of "difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration, and using his hands[,]" and his report that he could only walk 50 feet and then would have to stop and rest for 15-20

---

[2] In support of the validity of his statements, Plaintiff cites to his testimony regarding activities of daily living, evidence of his numerous medical conditions, prescribed and recommended medications, numerous medical visits (including with specialists), hospitalizations and surgeries, and his use of oxygen and a knee brace. *Id*. at 12-14.

minutes. (R. 20, 259). Regarding daily activities, she noted Plaintiff took care of pets, performed personal grooming, prepared simple meals once or twice per week, took out the trash, drove, shopped once a week, could go out alone, and could count change. He could no longer hunt, fish, do woodworking, mow, or weed eat. (R. 20, 256-58). The ALJ considered Plaintiff's hearing testimony, including that he could no longer perform "plumbing work" because of his knee, or other activities because of back pain and tingling and numbness in his legs from standing too long. (R. 20, 46). Plaintiff testified his right knee replacement made his knee worse, and he experienced pain in both knees. (R. 20, 47-48). Standing made Plaintiff's back hurt, which he could only do for seven to ten minutes. (R. 20, 48-49). Plaintiff could walk 150 feet before he would be out of breath and needed to rest. (R. 20, 49). Plaintiff used oxygen at night and when he was short of breath during the day. (R. 20, 49-50). He could not do household chores because of his back, and he occasionally used a knee brace when his knee felt unstable. (R. 20, 51-52). The ALJ noted Plaintiff did not take seizure medication, but he did take heart medication and Gabapentin at night for pain. (R. 20, 52-53).

The ALJ then determined Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms" but his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 20). As support, the ALJ explained such statements were "inconsistent because the totality of the evidence does not support [Plaintiff's] allegations of disabling pain or functional impairment. The [Plaintiff's] treatment history . . . is not indicative of someone with his alleged level of pain or functional limitation." *Id*. at 20-21, 26. She further determined that Plaintiff's "[t]reatment records

16

show consistent and continued non-compliance with treatment and treatment recommendations[.]" (R. 26).

As previously outlined herein, the ALJ discussed in detail Plaintiff's treatment history for alcohol abuse disorder, reports of pain in his knees and back, right knee replacement surgery and post-surgery treatment, and hospitalization and treatment associated with his COPD, including treatment from orthopedic surgeons and his primary care physician. (R. 21-25). While doing so, she considered many abnormal examination findings regarding Plaintiff's back, knees, and COPD, but also pointed out normal findings suggesting Plaintiff was not as limited as alleged. *Id*. For example, she acknowledged Plaintiff had poor mobility with flexion and extension in his lumbar spine, secondary to pain in November of 2021, but he could transition from a sitting to standing position, had good strength through the lower extremities, and was able to heel and toe walk. (R. 23). She further referenced examination findings from April of 2022, wherein Plaintiff's lumbar spine was non-tender to palpation, he had a full range of motion in all planes, and his straight leg raise test was negative bilaterally. (R. 25). She also discussed Plaintiff's use of a knee brace post-surgery (R. 23), his complaints of pain and swelling in his right knee in May of 2022, and trouble walking in August of 2022 (R. 25). However, in November of 2022, Plaintiff reported he was doing fine. *Id*. Regarding his COPD, the ALJ noted several normal respiratory findings (R. 22-23), but also discussed his hospitalization for shortness of breath for severe COPD in January of 2022 and continued complaints of shortness of breath on exertion. (R. 23-25). She referenced the various medications Plaintiff used to treat his COPD, including his use of oxygen and inhalers. (R. 24-25). Moreover, the ALJ detailed Plaintiff's non-compliance with treatment recommendations from his healthcare providers, including his leaving the hospital against medical advice when treated for alcohol abuse and COPD (R. 21, 23-24), failing to attend in-patient or out-

patient rehabilitation (R. 21-22), declining to receive a recommended epidural steroid injection because it "hurt" (R. 23), failing to elevate and ice his knee after surgery (R. 23), failing to obtain a recommended pulmonary function test (R. 24, 25), and declining recommended physical therapy for his right knee (R. 24, 25).  (R. 26).

The Court finds the ALJ's discussion of Plaintiff's subjective complaints and the objective evidence allows for meaningful review of her consistency determination, and the Court cannot therefore determine that the ALJ misread the medical evidence as a whole.  *See Casias*, 933 F.2d at 801.  Although Plaintiff identifies evidence that allegedly supports his symptoms, this simply invites the Court to re-weigh the evidence, which it will not do.  *Id*. at 800.

## Conclusion

For the foregoing reasons, the ALJ's decision finding Plaintiff not disabled is **AFFIRMED**.

IT IS SO ORDERED this 26th day of July, 2024.

_____
MARK T. STEELE, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT